IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

SERENA GARVIN & KATHERINE
MURPHY,

        Plaintiffs,

vs.

SIOUXLAND MENTAL HEALTH
SERVICES, INC. d/b/a SIOUXLAND
MENTAL HEALTH CENTER; KIM
FISCHER-CULVER and JIM RIXNER,

        Defendants.

No. C10-4107-MWB

MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

_____

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      1. Facts related to Katherine Murphy's claims . . . . . . . . . . . . . 3
      2. Facts related to Serena Garvin's claims . . . . . . . . . . . . . . . 21
   B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   A. Summary Judgment Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   B. Plaintiffs' Sexually Hostile Work Environment Claims . . . . . . . . . . . 40
      1. Elements of claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      2. Murphy's sexually hostile work environment claim . . . . . . . 42
         a. Limitations period . . . . . . . . . . . . . . . . . . . . . . . . . 42
         b. Continuing violations . . . . . . . . . . . . . . . . . . . . . . . 45
         c. Merits of Murphy's claim . . . . . . . . . . . . . . . . . . . . 49
      3. Garvin's sexually hostile work environment claim . . . . . . . 53
         a. Actionable harassment . . . . . . . . . . . . . . . . . . . . . . 53

   *b. The Ellerth/Faragher affirmative defense* . . . . . . . . . . . 55
     *i.*   *Tangible employment action* . . . . . . . . . . . . . 55
     *ii.*   *Does SMHC meet the defense's requirements?* . 58
 *C. Plaintiffs' Retaliation Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 59
  *1.*   *A* **prima facie** *case* . . . . . . . . . . . . . . . . . . . . . . . . 60
  *a.*   *Protected activity* . . . . . . . . . . . . . . . . . . . . . . . . . 60
  *b.*   *Causal connection* . . . . . . . . . . . . . . . . . . . . . . . 61

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Plaintiffs, a former female mental health therapist and a female community support specialist of a mental health services provider, allege that they were subjected to a sexually hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act, IOWA CODE CH. 216. The defendants—a mental health services provider, its executive director, and a supervising employee —have moved for summary judgment on all of the plaintiffs' claims. Thus, I must determine which, if any, of the plaintiffs' claims should go to a jury.

## I.  INTRODUCTION AND BACKGROUND
### A.  Factual Background

I set forth those facts, both undisputed and disputed, sufficient to put in context the parties' arguments concerning defendants' motions for summary judgment.  Unless

otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in my legal analysis.

### 1.    *Facts related to Katherine Murphy's claims*

In 2002, plaintiff Katherine Murphy was hired by defendant Jim Rixner as a contract therapist for defendant Siouxland Mental Health Services, Inc. d/b/a Siouxland Mental Health Center ("SMHC"). Rixner is SMHC's executive director. In February 2005, Murphy was hired by Jenny Crew as a full time, regular employee of SMHC working as a mental health therapist. At that time, Jennifer Crew became Murphy's immediate supervisor. Crew's immediate supervisor was Rixner.

In the summer of 2005, Murphy was told to begin reporting to defendant Kim Fischer-Culver. Discussions about the Child Waiver Program started that summer. The Child Waiver Program was a program for severely emotionally disturbed children who would come for treatment to SMHC. Crew and Fischer-Culver asked Murphy to be the clinician for the Child Waiver Program and Fischer-Culver would do the administrative work for it. After Murphy began her duties with the Child Waiver Program, Crew continued to be Murphy's immediate supervisor. However, Fischer-Culver occupied a managerial role over Murphy. Murphy claims that Fischer-Culver was her supervisor with respect to the Child Waiver Program "because she ran the waivers, all of them. They were administered through her, all of the information was disseminated through her. The -- everything. She hired the case manager for that position." Murphy Dep. at 70; Defendants' Murphy App. at 12. However, Fischer-Culver did not require Murphy to make any daily, weekly, or monthly reports to her regarding the Child Waiver Program. Murphy did not have to provide Fischer-Culver with time records showing her time spent

on the Child Waiver Program. Murphy had numerous telephone calls with Fischer-Culver regarding the Child Waiver Program. Murphy concedes that the subjects of these calls were appropriate. From the summer of 2005 to September 2005, Murphy still officially reported to Crew.

Fischer-Culver had a lesbian relationship with her college roommate between 1990 through 1992. She ended the relationship because "it wasn't something that I wanted in my life" and "I wanted to move on with my life and I wanted to get married and have children." Fischer-Culver Dep. at 250; Defendants' Murphy App. at 50. Fischer-Culver married Gary Culver in 1997. She and her husband have three children.

In September 2005, Murphy claims that Fischer-Culver sexually harassed her. In September 2005, during a trip to Des Moines, Fischer-Culver told Murphy that she knew that Murphy was in recovery and sitting on the drug court. Fischer-Culver inferred that Murphy was in recovery because Murphy sat on a drug court and, generally, persons in recovery sit on the drug court. Fischer-Culver explained that she had just begun recovery for alcohol herself and asked if she could use Murphy as a resource support person, particularly on the weekends. Murphy said "absolutely" and they discussed Fischer-Culver's alcohol issues.

Murphy believes that it is common for persons in recovery to seek out others in recovery for support. She also believes that disseminating information obtained from persons in recovery is "viewed negatively" and that there is an expectation that details shared with others in recovery are kept private.

After the trip to Des Moines, Fischer-Culver telephoned Murphy once on a weekend. Murphy related that during this call:

> A:    She told me that it was very difficult that particular day
> because there was a Coyote USD football game,

tailgating was a big part of their social life, and it was just a pretty difficult day for her.

Q.   And what, if anything, did you say?

A.   I just asked that--suggested that she continue to stay connected to people that weren't drinking or she may need to avoid that.  One of the things in AA is change your playgrounds and your playmates, so she may need to not go to the tailgating.

Q.   Anything else about that conversation, either what she said or what you said that you can recall?

A.   Yes.  Then she disclosed to me that she was aware that a good deal of her drinking was due to the fact that she was a lesbian and that she was never able to disclose that.

Q.   Did you respond in any way?

A.   Yes.

Q.   In what way?

A.   I told her she would not be the first person and she wouldn't be the last person to drink at that kind of confusion, and I suggested she continue in her AA meetings and her therapy.

Q.   Up to that point in the conversation that we've covered so far, did you consider anything about that phone call inappropriate?

A.   No.

Q.     Did you at that time while you are talking to Kim on the phone that day view her as your supervisor at work?

A.     That day I viewed her as an alcoholic in need.

Q.     You didn't say up to this point in the conversation, you know, anything like, you know, Kim, because we have work interaction I don't know if I'm the right person or I feel uncomfortable listening to your details?

A.     No.

Q.     What else was said then in the conversation?

A.     I--I don't remember any specifics other than those.

Q.     You are not claiming in this case that the phone call was unwelcome?

A.     No.

Murphy Dep. at 80-82; Defendants' Murphy App. at 14-15.

A few days later, Fischer-Culver called Murphy's office asking if Fischer-Culver could stop by.  Murphy said "sure."  Murphy relates that the following then occurred:

A.     She came to my office.

Q.     Tell me what transpired.

A.     She said that she had just left therapy and that she had come to understand that I reminded her a great deal of her great true love, who was her roommate, and that she wanted to know if I would be interested in having a relationship with her.

6

Q.     She asked you that in your office at Siouxland Mental Health Center?

A.     Yes, she did.

Q.     No one else was present, I assume?

A.     No one else.

Q.     And what was your response?

A.     My response was I'm straight, I have been married for 21 years, and that's how it's going to continue.

Q.     Did you make any other comment?

A.     No.

Q.     Kim left then?

A.     No.

Q.     What happened?

A.     She spent about another hour talking about this particular person that she was in love with and why she didn't stay in that relationship, and –

Q.     She stayed for an hour?

A.     Yeah, an hour or better.

Q.     And at any point when she started talking about that, did you tell her that she needed to leave?

A.     No.

7

Q.    Did you ever tell her that the things she was talking about to you in a work environment were unwelcome to you?

A.    No.

Q.    Why didn't you do any of those things?

A.    I became very aware that it was just the two of us in the building, and I just wanted to leave the building.

Q.    Did she physically restrain you in any way from leaving the building?

A.    No.

Q.    Couldn't you have gotten up at any time during that hour and said I've got to go and left?

A.    I did.

Q.    That's how it ended finally?

A.    Yes.

Murphy Dep. at 82-85; Defendants' Murphy App. at 15. Fischer-Culver denies that she asked Murphy to have a sexual relationship.

That same evening, Murphy received repeated telephone calls from Fischer-Culver. Murphy talked to Fischer-Culver once and describes that conversation as follows:

A.    Okay. Kim referenced it yesterday. I was -- after I met with her, I met my husband up at Green Gables for dinner, and I was ready to tell him what happened because I wasn't absolutely certain how to process it. So he--I was getting ready to tell him, and she called me a couple times and I didn't take the call. So I

finally took the call, went up to the lobby, and she was very panicky, and said are you going to tell anybody? Are you going to tell your husband?  Please don't tell your husband.  And I told her that I was having dinner with my husband.  I told my husband everything, I was certainly going to tell him this, and that I thought she needed to take her recovery needs elsewhere.

Q.    So did you make some statement like don't call me anymore?

A.    Yes.

Q.    Did she call you anymore?

A.    Yes.

Q.    That night?

A.    Yes.

Q.    After that night?

A.    Yes.

Q.    How many other nights did she--or days did she try to call you?

A.    She called me repeatedly on my cell phone for a couple weeks, but a week in particular before she–

Q.    So the calls lasted at least two weeks?

A.    Yes.

Murphy Dep. at 87-88; Defendants' Murphy App. at 16.

After the first week of calls to her cell phone, Fischer-Culver called Murphy on her office telephone.   Murphy relates the following conversation occurred:

> A.   She asked me if I was mad at her.  She said she was sorry.  She really didn't want me to be mad at her.  She didn't want me to tell anybody.  And then she asked me again if I was interested in having a relationship with her.
>
> Q.   So the night you were at Green Gables, you told her she should take her recovery elsewhere?
>
> A.   Yes.
>
> Q.   How did she respond to that?
>
> A.   She said she was going to a meeting that night.
>
> Q.   And then the next phone call you had with her was where, that you actually talked to her?
>
> A.   Was a week later on my office phone.
>
> Q.   And when she made those statements to you on your office phone, what was your response?
>
> A.   Then I got angry and I told her, yes, I was sure.  Don't ask me that again.  I don't want any more phone calls with you, only e-mails concerning the Waiver Program and through the office e-mail.

Murphy Dep. at 89-90; Defendants' Murphy App. at 16-17.   Murphy claims that she received additional telephone calls from Fischer-Culver for another week.  Murphy admits that the incidents of alleged overt sexual harassment are confined to this two week period

in September 2005.  In that period, Murphy claims that Fischer-Culver twice asked her for a sexual relationship.  There were no other overtures in that period.

The morning after her office telephone call to Murphy, Fischer-Culver came to Murphy's office.  Fischer-Culver told Murphy that she was no longer going to be involved in the Child Waiver Program and that Murphy would be responsible for the program in its entirety.  Murphy explained that she could not take responsibility for the program's administration because she did not have the training to do it.  Fischer-Culver knew that Murphy was not trained to run the program and that she did not have management experience.  Fischer-Culver told Murphy that she would send Ruth to train Murphy on ISIS.

After that conversation, Murphy continued to have e-mail exchanges with Fischer-Culver about the Child Waiver Program.  In addition, Murphy received a message on her cell phone from Fischer-Culver, which Murphy describes as follows:

> That--well, we had--in the conversation that we had I told her I would take responsibility for the Waiver Program.  I didn't have the training to do it.  She needed to then go to Jim Rixner and explain to him why the Waiver Program would not be then administered and then she needed to let the case manager know why she no longer had a job.  She said she would think about it and she would get back to me.  And then a week later I got a phone call with a message on my cell phone saying that she was in, she would do her part.  I called her back.  We agreed that I would do the treatment plan portion, the direct services of therapy with the children, and she would do her part as an administrator, and then she said in 6 to 12 months you can just take the program.

Murphy Dep. at 91-92; Defendants' Murphy App. at 17.

11

Murphy believes that Fischer-Culver had sexually harassed her by the time of their conversation about Murphy assuming the duties of the Child Waiver Program.   By that point, Murphy believes that a boundary had already been set which required Fischer-Culver to contact Murphy only through e-mail.   Murphy did not immediately report Fischer-Culver's actions.   When asked why she did not do so, Murphy  offered this explanation:

A.   Because I didn't want to lose my job.

Q.   Why did you think you would lose your job?

A.   Because she was second in command.  I was a new hire.  It was her word against my word.  There was no proof.

Q.   And did anybody ever confirm that for you?

A.   That she was second in command?

Q.   No, that if you would have complained at that time you would have got fired.

A.   At that time did it–

Q.   Yes.

A.   --get confirmed?  It got confirmed later, not at that time.

Q.   Because you didn't --you didn't tell anybody about it for a year and a half?

A.   Correct.

Murphy Dep. at 93-94; Defendants' Murphy App. at 17-18.

Murphy claims that Fischer-Culver immediately began retaliating against her. She believes this retaliation consisted of the following:

> She was withholding information about the waiver. She withheld training. Her and Jim had discussion [sic], based on her testimony yesterday, about me not going to some of the things provided in Des Moines so that I would be well-versed on that program. I was not given any information about when people came from Des Moines to review our program or to audit our program. That stuff started immediately.

Murphy Dep. at 94-95; Defendants' Murphy App. at 18. Murphy claims that as a result of Fischer-Culver's alleged retaliation, "I believe I wasn't as effective in running that program." Murphy Dep. at 95; Defendants' Murphy App. at 18. Murphy concedes that she was not demoted or disciplined in any way because of her claimed lack of access to information. After one year passed, Fischer-Culver did not turn the program over to Murphy as they had agreed. When Murphy approached Fischer-Culver about taking over the Child Waiver Program as they had previously agreed, Fischer-Culver refused. Between September 2005 and June 2007, Murphy was not disciplined, demoted nor did her job assignments change. Murphy, however, claims that the delay in her taking over the Child Waiver Program was an act of retaliation.

In March 2007, Fischer-Culver called the therapy building about a client in crisis, and wanted to know when a therapist would be available. Murphy was primarily hired as a child therapist but had a client scheduled at that time. The client, however, had not yet shown up for the appointment. Murphy was asked by the office staff if she could see Fisher-Culver's crisis client if Murphy's client did not show. Murphy agreed, but then her client showed up. As a result, Murphy was unable to see Fischer-Culver's crisis client. Murphy was unable to find Fischer-Culver to tell her that she could not see the crisis

client.  Murphy contacted the office and was told a crisis counselor would be available to see Fischer-Culver's crisis client.  At the next staff meeting, Fischer-Culver told the rest of the staff that Murphy had refused to see her crisis patient.  Murphy believes that Fischer-Culver's negative statements about her affected Murphy's ability to do her job because it had a negative effect on her credibility and divided the office against her.

In 2007, Murphy spoke with Tonya Meier, another therapist at SMHC, about Fischer-Culver's sexual advances toward Murphy.  Murphy also told Meier about Fischer-Culver's attacks on Murphy's character and what she viewed as Fischer-Culver's "stalking like behavior" toward her.  Meier encouraged Murphy to report what Fischer-Culver had been doing to her immediate supervisor, Jennifer Crew.  In the meantime, Fischer-Culver had reported to Rixner that Murphy was unable to run the Child Waiver Program effectively.  Fischer-Culver and Crew discussed the possibility of Murphy taking over the program in a year or two, after Murphy received further training from Fischer-Culver.

In June 2007, Murphy told Crew that she would like to leave the Child Waiver Program because she did not want to work with Fischer-Culver anymore.   When Crew asked why, Murphy told Jenny Crew about what had transpired with Fischer-Culver in September 2005.  Crew was the first supervisor at SMHC that Murphy told about those incidents with Fischer-Culver.   Crew advised Murphy to go to Rixner about her complaints.  Approximately one week later, in June 2007, Murphy specifically told Rixner of Fischer-Culver's alleged sexual harassment.  Rixner was not aware of the alleged sexual harassment of Murphy by Fischer-Culver until after it had occurred.  After being told of Fischer-Culver's alleged sexual harassment, he told Murphy she would take over the Child Waiver Program immediately.

SMHC had a sexual harassment policy requiring it to respond to sexual harassment and document sexual harassment complaints. SMHC's sexual harassment policy required the executive director to undertake an investigation of a complaint. Rixner did not consider Murphy's complaint about Fischer-Culver to be a sexual harassment complaint. As a result, he did not document Murphy's complaint.

After Murphy was told she would take over the Child Waiver Program, Fischer-Culver told other employees that Murphy stole the program from her, and initially refused to allow Murphy to be trained. Fischer-Culver also failed to send a new patient over to Murphy on referral. Murphy was eventually trained by another employee, Ruth Sanchez. Sanchez begged Murphy not to tell anyone for fear of losing her job. When Fischer-Culver found out about the training, she yelled at Sanchez.

After the Child Waiver Program was turned over to Murphy, Murphy claims that Fischer-Culver continued her retaliation:

> Many ways after that. That is definitely when a lot of her group would hover around my office. I would get glares. They would stand there and laugh and be somewhat disruptive when --.

Murphy Dep. at 111; Defendants' Murphy App. at 22.

Murphy went to Rixner and told him that she was working the bugs out of the Child Waiver Program. Murphy also told him that Fischer-Culver was interfering with the program, which she viewed as continuing retaliation. Rixner responded by saying, "those are your words not mine." Murphy Civil Rights Complaint Statement at 4; Plaintiffs' App. at 107. Murphy concluded from Rixner's statement that he did not want to hear any more complaints from Murphy about Fischer-Culver.

15

In July 2007, after a co-worker complained about "bullying" from Fischer-Culver, Murphy went to Rixner.  Murphy relates that the following exchange occurred:

> When I entered the office, Jim Rixner was visably angry.  His lips were pursed and shaking.  He pointed at me and yelled, what was the last thing I said to you?  I asked what?  Jim Rixner repeated his question.  He told me I was to leave Kim Fischer Culver alone and going down to her building was against his direction and I would be disciplined. I was angry and questioned why he would discipline me for going down to the other building but Kim Fischer Culver was not disciplined for sexually harassing me and bullying others. He was yelling at me and I at him.  I told him I would not allow him to talk to me like he was, after what Kim Fischer Culver did to me.  He threatened me with some form of discipline.  I asked if he was threatening to fire me?  He said yes he may but had not decided yet.  Jennifer Crew asked him if he would truly fire the best therapist and he said he would. He said that my going down to Kim's building was just to start problems and that Jennifer Crew should not have permitted me to go.  Jim Rixner said that this was poor judgment on Jennifer Crews [sic] part.
>
> I told Jim Rixner that I knew that Kim Fischer Culver would be angry that I stepped foot on her territory.  I told him that she was a perpetrator and I knew it for certain.  Kim Fischer Culver's reaction to me coming into her office building was that of a perpetrator's.  I told him that Kim Fischer Culver would perpetrate again, because that is the nature of perpetrators.

Murphy Civil Rights Complaint Statement at 5; Plaintiffs' App. at 108.

During this same conversation, Rixner asked if Murphy was "ever going to let this go?"  Murphy reports that the following then occurred:

> I told him I would be there the next time it occurred. I was
> told that I was not the "justice police". He commented that I
> just wanted Kim fired and I said yes that is what I wanted. I
> also told him that I knew that this was his decision to make and
> I was disappointed in him for not following up with my
> complaint or my attempt to talk to him about the retaliation.
> Jim Rixner told me that he believed I needed to find another
> place to work, since I had such little regard for him. I asked
> him again if he was threatening to fire me. Again, he said he
> may. I told him I would be happy to talk to an attorney if that
> was the new level he was taking this to. He told me to be very
> careful about threatening him. I told him it was not a threat
> but a promise. I reminded him that Kim Fischer Culver was
> bullying another employee, that she refused to let Ruth
> Sanchez train me and that there was a message on my phone
> from Ruth Sanchez clearly fearful for sneaking behind Kim
> Fischer Culvers [sic] back to train me on her own time, that
> Jim Rixner still had not even attempted to listen to or follow
> up on. Jim Rixner told me that he did not believe that Kim
> Fischer Culver was a problem based on my experience with
> her and he would never believe Dagmar, he didn't like her or
> have any respect for her word.

Murphy Civil Rights Complaint Statement at 6; Plaintiffs' App. at 109. At the close of

the conversation, Rixner reminded Murphy that she was an employee at will, and that she

had given him several reasons to fire her.

Although Fischer-Culver was not Murphy's immediate supervisor, she remained

in management above Murphy. Rixner told Murphy that she was second in the chain of

command. Fischer-Culver retained the power to hire or fire Murphy, and to control her

job. Later that day, Murphy and Rixner apologized to each other, and he indicated that

he believed what Murphy was telling him, and that Fischer-Culver could not give him an

explanation as to what had happened.

In August, 2008, Murphy decided to work part-time as a contract therapist and go back to school at the University of South Dakota to pursue a Ph.D. degree. Rixner sent a letter of recommendation to the University of South Dakota on Murphy's behalf. Murphy made the decision to go back to being a contract therapist so she could enroll at the University of South Dakota. She would not have been able to go back to school it she had stayed a full-time employee. Murphy claims that she wanted to secure her Ph.D. degree because "I needed to get out of the position I was working in at Siouxland Mental Health under the stress of dealing with what Fischer-Culver had done." Murphy Dep. at 48; Defendants' Murphy App. at 7. While working part-time, Fischer Culver and her associates continued to hover around Murphy's office, glaring and laughing at her.

In the spring of 2009, Murphy learned that Serena Garvin had lodged a complaint against Fischer-Culver. After speaking with Garvin, Murphy decided to call SMHC's board members. Murphy had difficulty obtaining the names and information for the SMHC board members. SMHC's Chief Financial Officer, Joel Petersen, would not make the list available because he was afraid of losing his job. Murphy and Garvin knew the identify of three board members and contacted them. Two of the board members would not talk to Garvin and the third did not want to discuss in any detail what had happened.

Murphy was troubled when she learned that Fischer-Culver had updated her Facebook "status". As a result, Murphy went to Rixner, and was advised, "Katy, you need to get past that, I am." Murphy Civil Rights Complaint Statement at 9; Plaintiffs' App. at 112. Murphy responded that she was not past it, and that since learning of Garvin's new complaint, she was reliving her past experience. She also told Rixner that since Fischer-Culver was still working at SMHC, it could happen again.

18

On June 1, 2009, Murphy wrote to SMHC's board directly about her complaints, and indicated that she intended to file an EEOC complaint.  Rixner and SMHC hired the Heidman Law Firm to investigate Murphy's complaint that Fischer-Culver had sexually harassed her.  On June 29, 2009, Murphy was interviewed by an attorney from the Heidman Law Firm.  She was told that she would hear a response to her complaint by July 15, 2009.  When Murphy had not heard anything by July 15, she called the attorney, and followed up with a letter on July 31, 2009, in which she stated that the delay was unreasonable.  On August 6, 2009, after reviewing the outcome of the Heidman Law Firm's investigation, SMHC's board determined "that the facts do not support a finding that sexual harassment and/or retaliation occurred."  Heidman Law Firm Letter at 1; Defendants' Murphy App. at 137.  Murphy was informed of this determination in a letter from the Heidman Law Firm dated August 11, 2009.  Murphy responded by identifying, in a letter, what she viewed as a conflict of interest the Heidman Law Firm had in investigating her complaint because the law firm was already legal counsel to SMHC.

After Murphy renewed her complaints about harassment and retaliation in the Spring of 2009, she believes she was subjected to increased ostracism from SMHC's management, including Wade Kuehl and Joel Peterson.  They used to speak with her, but after she renewed her complaints, they stayed away from her and would barely speak to her.  Murphy also noticed that she was being shut out of meetings involving her clients.  Many times during 2009 and 2010, quarterly staffing reports regarding her clients were scheduled off-site and on days when management knew she would be gone taking classes.  In approximately October 2009, a sexual harassment training seminar was conducted at SMHC by Cindy Moser of the Heidman Law Firm.  During that seminar, co-workers

asked what could be done against an employee who made false sexual harassment allegations. Murphy viewed these statements as a threat against her.

Murphy also noticed that her case load was reduced by management. In the Spring of 2009, she was working approximately 22-25 hours per week at SMHC and taking a full course load in graduate school. Her hours were gradually reduced and she was scheduled to meet with fewer clients. Even though her specialty was counseling children, she advised management that she was willing to counsel adults. Nevertheless, her overall number of hours continued to decrease. Murphy filed an administrative complaint with the Iowa Civil Rights Commission ("ICRC") on September 4, 2009. After she filed her complaint with the ICRC, she was reduced to working approximately 10 to 12 hours a week. She was also forced to share an office, which she had not had to do since 2005.

In March 2010, SMHC hired a therapist who specifically worked with children and adolescents. This person was given a full case load. Murphy advised Wade Kuehl, the therapy supervisor, that she was able to work more hours, but her hours did not increase. In May 2010, Murphy finished her graduate classes and was available to work full-time again at SMHC. She advised SMHC's management about her change in circumstances, but she continued to work only 10 to 12 hours per week. In June 2010, Murphy discovered that her clients were being re-routed to another therapist in the office. Murphy complained to Wade Kuehl who told her that this was being done because she was not available to see the clients, even though she had previously told him that she was available to work full-time. When her hours did not increase above the 10 to 12 hours per week, Murphy resigned from SMHC in June 2010.

### 2.     *Facts related to Serena Garvin's claims*

In May 2008, plaintiff Serena Garvin was hired by Fischer-Culver to work in Community Support at SMHC.  Garvin moved from her position at Friendship House to Community Support.  Nothing inappropriate occurred during Fischer-Culver's interview of Garvin for the position.

Prior to starting work for SMHC, Garvin had a history of treatment for bipolar disorder, disassociative identity disorder, and post traumatic stress disorder.  Garvin advised SMHC of her conditions as well as the medications she was on when she was hired to work there.  Fischer-Culver was Garvin's direct supervisor.  Garvin had no problems working with Fischer-Culver in 2008.

Garvin sent a handwritten letter to Fischer-Culver.  Garvin believes that she sent the letter and card for Boss's Day on October 16, 2008.  Garvin's letter reads in part:

> Your Management style is wonderful.  I find you to be open; open to ideas, change, individuality and those things that may inspire both worker & client.  I find you to be a great resource of information & encouragement.  I also have found you to be trusting and this inspires trust.

Letter at 1; Defendants' Garvin App. at 60.  The letter also includes quotations from the book, "Imagine a Woman in Love with Herself".

On February 4, 2009, Garvin was asked to take the Supported Employment and Life Skills Coach for Access to Recovery position at SMHC.  The duties of this position were added to her Community Support responsibilities.  On February 17, 2009, Garvin had a training workshop with Fischer-Culver at AEA in Sioux City.  Nothing inappropriate occurred during this training.

In March 2009, Garvin joined Facebook and soon received a request from Fischer-Culver to be a "Facebook Friend."  On March 6, 2009, Garvin had training on the

computer in Fischer-Culver's office.  Nothing inappropriate occurred during this training.
On Monday, March 9, 2009, Garvin attended a training workshop in Des Moines, Iowa,
with Fischer-Culver.   They stayed in separate hotel rooms.   Nothing inappropriate
occurred in Des Moines.  They drove back to Sioux City on Tuesday, March 10, 2009.
 During the return trip, the conversation between Garvin and Fischer-Culver turned to
personal issues.   Garvin found some of the questions asked by Fischer-Culver
objectionable.   As Garvin has explained:

> Q.     Okay.  And I want to know what the questions were
> that you found objectionable on that trip back from Des
> Moines.
>
> A.     Questions such as how Doug and I met.
>
> Q.     Did you say that's none of your business?
>
> A.     No.
>
> Q.     Okay.  Did you tell Kim how you and Doug met?
>
> A.     Yeah.  Yes.
>
> Q.     Did you think that was an instance of harassment?
>
> A.     It felt odd.   It felt--it made me feel--the line, the
> questions made me feel small and served to remind me
> who's the boss.
>
> Q.     Other than asking you how you and Doug met, what
> other questions did you find objectionable in that ride
> back from Des Moines?
>
> A.     What kind of mental health things had I dealt with
> before, what--did I have a certain diagnosis of it, of any

22

> kind of things.  Did--after explaining how Doug and I
> met was how did my daughter feel about that, was she
> adopted or not adopted.  That was when we discussed--
> she had then stated how her and her husband met.  She
> said that they had gone through some rough times but
> we're--we're pretty much okay.

> Q.     So Kim was sharing personal–

> A.     Oh–

> Q.     --items also?

> A.     Oh, yeah.

> Q.     All right.

> A.     And then that was when I had said, you know, just, you
> know, kind of nod my head.  She asked if we had any
> difficulties.  And I said, well, I think anybody who
> deals with mental health issues like my husband and I
> have, you know, he has been there for me, then I think
> yes.

Garvin Dep. at 68-70; Defendants' Garvin App. at 5-6.  During the return trip conversation, Garvin also told Fischer-Culver that she had become acquainted with a person from Omaha on the internet.  She subsequently met this person in Omaha and that he had hurt her.

When Garvin and Fischer-Culver returned to the office on March 11, 2009, they discussed Garvin's case load.  Nothing inappropriate occurred during this discussion.  On March 13, at 6:20 p.m., Garvin received a text message from Fischer-Culver asking Garvin to get on Facebook.   On March 14, Garvin and her husband attended Fischer-Culver's surprise birthday party.  Approximately 20 people attended the party, including

7 or 8 co-workers.  At some point during the week, Garvin gave Fischer-Culver the book, "Imagine a Woman in Love with Herself."  Garvin does not recall if she gave the book to Fischer-Culver as a possible resource that might be used in therapy or because she thought Fischer-Culver would benefit from reading it.

While home sick, Garvin received a text message or telephone call from Fischer-Culver on March 17, and a telephone call from her on March 18.  During the call on March 18, Fischer-Culver asked Garvin "How are you?" and "How are you doing?" Garvin considers it "inappropriate", "wrong", and "crossing the line" to have your superior call you while you are out sick.  On Friday, March 20, after coming home from work, Garvin received and responded to text messages from Fischer- Culver until the early morning hours of March 21. During this time, Garvin had a telephone conversation with Fischer-Culver that started at 12:20 a.m. and lasted 136 minutes.    During this conversation, Garvin contends that Fischer-Culver brought up the following personal issues:

> A.    The ones that she had brought up herself here about being young and she had a friend of the family who had been incestuous to her.  She started I believe with that part of the conversation.

> Q.    What other private issues did she speak of?

> A.    She told me that she was taking anti--I believe it was a form of antianxiety medication and that she just was overtaking it and planned on spending the weekend in bed, which is what had originally gotten me concerned. She talked a lot about how she felt about the memories she was having of what had happened to her when she was young with the friend of the family.  She at first said that she had these things that she wanted to talk

> about, and – and I had asked her if she was going for
> therapy, and she said that she wasn't.  And I said have
> you ever gone to therapy, and she said that she had
> before.  And I said, you know, you really need to talk
> to a therapist.  I told her I was not a therapist.

Garvin Dep. at 81-82; Defendants' Garvin App. at 8-9.  Garvin did not consider anything said by Fischer-Culver during this telephone call to be sexual harassment.

On Saturday, March 21, 2009, Garvin and Fischer-Culver had a 65 minute telephone conversation.  Garvin recounts the following about that conversation:

> When Kim was on the phone and there was--she was very
> upset and talking about the lesbian relationship that she had,
> and I'm not sure I understand.  I don't know, it seemed that
> she had a lot of shame around it.  I'm not really sure I
> understand that, but I just told her that, you know, I --my
> friend and I had been mistaken as a lesbian couple.  It's not--
> it's not a bad thing.  My sister and I have been before
> mistaken as a couple.  So, you know, it's not--I had used that
> as an example to try and address that it's not a shameful kind
> of thing and that I would understand.  That I have no judgment
> towards anything she is saying I guess is what I'm trying to
> relate.

Garvin Dep. at 92; Defendants' Garvin App. at 11.  On March 22, 2009, during a Facebook chat between Garvin and Fischer-Culver, Garvin claims that Fischer-Culver asked Garvin if hypothetically she would  have a relationship with her.  This, allegedly, was the first time Fischer-Culver ever made such an overture toward Garvin.

On March 23, 2009, when Garvin came to her office she found the book  "Imagine a Woman in Love with Herself", which she had previously given to Fischer-Culver, open and sitting on her desk with a note from Fischer-Culver which read:  "This is the section I first opened to today.  I read it and it is exactly how I am feeling. . . .Tell me what you

think." Note at 1, Defendants' Garvin App. at 55. The section contained a discussion of experiencing bodily sensations, including an "ache in my heart", "tingling in my genitals", and "fire rising in my neck." Garvin Dep. at 129-30; Plaintiffs' App. at 19-20.

Garvin claims that the note and the book led to confrontation with Fischer-Culver later that day when Fischer-Culver again asked her about having a relationship. Garvin described the conversation as follows:

> She came into the office with -- said that she wanted to ask me something about work, which as I remember right, it seemed such an easy question about work, and then wanted to shut the door, and then sat down behind me, behind where my chair would go to my desk. There was a chair over here, so she sat back over here. And I turned around this way, and she then wanted to talk about the things we had been talking about. And I said what do you mean? And she said, well, the same things we were talking about yesterday. And I said such as? And she said, well, you know, our relationship. To which I just – then that is when I got upset because I had talked to my sister over lunch and I said I cannot deal with this anymore. And I had already talked to my sister some and told her what was going on, what I had been experiencing, and that then I had come and found this over lunch with a certain chapter tagged in it. And she said you have to tell her to stop. And she wanted her phone numbers, and I said, you know, you can't do that. So – so that's when I told – I just --I told Kim, I said I --and I was terrified because I was afraid I was going to lose my job. So I said --and I got very upset, but I said, listen, I only want to talk to you at work about work. That's – that's – that's all.

Garvin Dep. at 98-99; Defendants' Garvin App. at 13. During the conversation, Garvin also told Fischer-Culver about a lesbian Garvin had kissed once and that the woman would then not leave her alone. Fischer-Culver then to touch Garvin. As Garvin explained:

> Touching my arm.  And--and to which then I moved like this.
> And she said, well, I don't understand.  What's wrong all of
> a sudden?  What's wrong?  And I said, you know, I just – I
> can't talk to you about these sex things--sex things anymore.
> And then that's when I gave her the example about Jamie, and
> that's when I told her, you know, I can't--I can't do this.  I
> can't--it--this can't be talked about anymore.  And her
> response then is, well, what about what we've had?  What
> about the last two weeks? And I just said I--what do you mean
> what we have?  And that's when, you know, then she starts
> getting upset, and that made me more upset, and I'm starting
> to get worried about what--what now?  What is going to
> happen now?

Garvin Dep. at 99-100; Plaintiffs' App. at 14.

On March 27, 2009, Garvin claims that Fischer-Culver asked her again for a sexual relationship during an on-line chat.  Garvin also claims that during an on-line chat that day, Fischer-Culver asked if Garvin would share a room with her at an upcoming conference in Des Moines.  Fischer-Culver, however, claims that it was Garvin who asked her to share a room at the Des Moines conference.  Garvin said she would share a room, but then Fischer-Culver told her that she did not want to share a room with her because she would want to kiss her.

Fischer-Culver continued to make phone calls and send text messages to Garvin up to March 30, 2009.  On March 30, 2009, Fischer-Culver and Garvin had an exchange.  As Garvin recounts:

> I received a call from Kim on my office phone at
> approximately 10:00.  She stated 'so when are you going to
> talk to me.'  I told her 'I am talking to you now.'  She asked
> me if I was going to go to Jim or what I was going to do.  I let
> her know I did not know what I was going to do.  I also let her
> know I was very upset and that I had called before I came to

> work and I had a therapy appointment and would be gone at
> 1:00 until shortly after 2:00.   She then became upset and
> started to cry and said 'you know what your therapist will
> say'.  I told her 'no I don't know what my therapist will say,
> that is why I am going.'  She then said 'I need to know if you
> are going to Jim, I will not be interrogated again, I will resign,
> you have to tell me before you go to Jim.'

Garvin Aff. at 12; Plaintiffs' App. at 76.  Fischer-Culver continued to ask Garvin if she
was going to report her to Rixner, and then the conversation concluded.  Fischer-Culver
called Garvin again that morning at 11:00 a.m. and asked, again, if Garvin was going to
report her, and told Garvin that she would have to tell Rixner everything that Garvin had
also said to her.

On April 1, 2009, Garvin told Tammy Jacques at SMHC what had been happening
and asked for her advice about what to do next.  Jacques advised Garvin to speak with
Rixner when he returned to the office on April 6.  Garvin also asked Jacques for a copy
of SMHC's sexual harassment policy.  Jacques could not locate a copy of the policy.

On April 6, 2009, Garvin complained to Rixner about alleged sexual harassment by
Fischer-Culver.  Rixner claims that he took Garvin's complaint very seriously.  As he
explained,

> I knew it had a profound effect on her.  I knew that the
> relationship that had developed between Kim and Serena was
> a relationship that was very harmful to Serena and never
> should have happened, and I did everything in my power to
> stop that relationship from continuing in any way.

Rixner Dep. at 272;Defendants' Garvin App. at 29.  Rixner, however, did not view the
relationship as "sexual harassment" and never identified Garvin's complaint as one of
sexual harassment.  On April 13, 2009, he told Garvin that "boundaries had been crossed
on both sides."  Rixner and SMHC engaged the Heidman Law Firm to help determine

whether there was any sexual harassment.  On April 14, 2009, Rixner told Garvin that the investigation had been turned over to the Heidman Law Firm.  Garvin cooperated with the investigation, including turning over text messages and Facebook information.

On May 6, 2009, in response to Garvin's complaint, Rixner suspended Fischer-Culver for one week without pay, demoted her from her supervisory position, and reduced her salary by twenty-five percent.  Rixner demoted Fischer-Culver because she had become close friends with a subordinate.  On May 6, Rixner told Garvin about the results of the investigation.  He told Garvin that "You were right and you were wrong."  Rixner also told Garvin that Fischer-Culver was no longer her supervisor, that Fischer-Culver would not have control over her actions, and that Fischer-Culver was to have no contact with her.

On May 7, 2009, Garvin called Rixner and told him about alleged harassment she had been receiving from co-workers following the announcement of the sanctions imposed on Fischer-Culver.  On May 7, Garvin also found out from Rixner that she, and not Fischer-Culver, was going to be moved to a different building.  Garvin complained to Rixner about this move, telling him that she should not be the one penalized.  During the week of May 11, 2009, Garvin was ostracized by co-workers.  Her co-workers would not speak to her, or, if they noticed her nearby, would either stop speaking or glare at her. No one was appointed to be Garvin's supervisor, which caused difficulties with her work.

On May 14, 2009, Garvin arrived at work for a staff meeting and sat down at a table.  As co-workers arrived, they intentionally moved their chairs to the side of the table where Fischer Culver was sitting.  Garvin viewed this as a sign of support for Fischer-Culver and against her.  When the meeting began the two seats closest to Garvin were empty.  The individual seated one seat away on Garvin's right side turned her chair so that

her back was to Garvin.  The individual one seat to the left of her did not speak to her during the meeting.  Garvin recounts that the following occurred during the meeting:

> Sheryl Reller stated she would like to say to Kim how much she appreciated the time she had given in her position as supervisor to community support services.  She gave a short speech about how she felt about Kim.  Mary Pearson also spoke about how she appreciated Kim and the things she has done as manager and talked about the 'upheaval last week.'  Gloria Meier then spoke and talked about the years of Kim's service and her dedication to Siouxland Mental Health.  Gloria talked about the grants Kim had gotten for the main building and the programs she has started for all people in the area.  Mary stated that 'they will spend over 1,000.00 to put an ad in the paper.  I just don't understand.'  During this conversation I received several glares from my co-workers who I had once thought of as friends.
>
> Kim then spoke.  She thanked everyone for the things they said and stated it was her friends who helped her through the last few weeks.  She stated she was 'grateful to have a job even as a case manager'.  Everyone laughed and someone I am not sure who did the 'bullshit' cough.  Several people stared at me.

Garvin Letter at 4; Plaintiffs' App. at 84.

On May 22, 2009, in a letter to Rixner, Garvin outlined what she viewed as the continuing retaliation and ostracism from her co-workers.  She asked why there had been no finding that sexual harassment had occurred.  She also asked for an explanation of what she did wrong and for a copy of SMHC's sexual harassment policy.  On June 1, 2009, Rixner responded to Garvin in a letter.  Rixner explained that, based on the investigation, they had not been able to definitely determine whether sexual harassment had occurred,

and told Garvin that the relationship between her and Fischer-Culver appeared to be mutual:

> At the conclusion of the investigation, we were unable to definitely determine, based on the prevailing legal "reasonable person" standard and the information obtained in the course of our investigation, that sexual harassment had occurred. It was clear, however, that you and Ms. Fischer-Culver had established a close relationship during the course of which each of you shared information of an intimate personal nature. This relationship appeared, for at least a period of time, to be welcomed by both of you. As a result of this, we concluded that Ms. Fischer-Culver had failed to observe the boundaries required of supervisory personnel at Siouxland Mental Health Center. Supervisors are discouraged from developing close personal friendships outside of work with the employees they supervise because such relationships may give rise to a perception of favoritism and make it more difficult for the supervisor to effectively manage the employees under the supervisor's direction. As a result of Ms. Fischer-Culver's actions, significant disciplinary action was taken against her, including a five (5) day suspension without pay and demotion to a non-supervisory position with a corresponding reduction in pay.

Rixner Letter at 1; Plaintiffs' App. at 87. In response to Garvin's allegations of ostracism in the workplace, On June 1, Rixner wrote:

> The incidents you describe were understandably upsetting to you. However, based on our understanding of the law, they do not constitute evidence that you experienced the kind of co-worker conduct that would discourage a reasonable employee from making or supporting a charge of discrimination. Please be assured that Siouxland Mental Health Center will continue to monitor your working environment and will encourage employees to treat all co-workers with common courtesy and respect.

31

Rixner Letter at 2; Plaintiffs' App. at 88.  Rixner enclosed a copy of the sexual harassment policy with his letter.

On June 2, 2009, before she received Rixner's letter, Garvin wrote a letter to Rixner in which she explained that she had not received a response to her letter and discussed the ongoing retaliation she was experiencing.  On June 8, 2009, Garvin was taken off work on the advice of her doctor.  Garvin believed she had no alternative but to go on sick leave because she had asked SMHC to rectify the situation but it had not.  Garvin did not return to work due to her mental health status.  On June 12, 2009, after receiving Rixner's letter, Garvin wrote a letter in response.  She outlined how she believed the harassment and retaliation violated the terms of SMHC's sexual harassment policy.  Garvin last worked at SMHC on June 8, 2009.  In a letter dated October 6, 2009, Garvin was notified that her employment with SMHC was terminated effective on October 5, 2009.  On October 5, 2009, Garvin filed an administrative complaint with the ICRC.

### B.  Procedural Background

On November 5, 2010, plaintiffs Serena Garvin and Katherine Murphy filed a Complaint against their former employer, defendant SMHC,  SMHC's executive director, Jim Rixner, and SMHC employee Kim Fischer-Culver,  alleging the following causes of action:  (1) claims of sexual harassment, in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I); (2) claims of retaliation, in violation of Title VII (Count 2); and, (3) pendent state law claims under the Iowa Civil Rights Act ("ICRA") for sexual harassment and retaliation, IOWA CODE CH. 216 (Count III).  On November 9, 2010, Garvin and Murphy filed an Amended Complaint against defendant Siouxland Mental Health Services, Inc. d/b/a SMHC, Rixner, and Fischer-Culver

(collectively "defendants" unless otherwise indicated), alleging the same claims as in the original Complaint.

On March 2, 2012, defendants filed separate Motions For Summary Judgment against Garvin and Murphy. In their motion against Garvin, defendants seek summary judgment on Garvin's sexual harassment claim because the alleged conduct was not sufficiently severe or pervasive to alter the conditions of Garvin's employment and fell short of creating an objectively hostile or abusive work environment. Defendants further argue that Garvin cannot establish her sexual harassment claim because SMHC took prompt and remedial action to end the harassment. Finally, defendants argue they are entitled to summary judgment on Garvin's retaliation claim because Garvin did not suffer any material adverse employment action after her harassment complaint.

In their motion against Murphy, defendants argue that Murphy's sexual harassment claim is time barred because her administrative complaint was not filed within 300 days of the alleged acts of sexual harassment. Defendants also assert that, even if Murphy's sexual harassment claim is not time barred, the alleged conduct was not sufficiently severe or pervasive to alter the conditions of Murphy's employment and fell short of creating an objectively hostile or abusive work environment. In addition, defendants argue that they are entitled to summary judgment under a co-worker analysis where the employer did not learn of the harassment until 1 and 1/2 years after it occurred. Alternatively, defendants contend that they are entitled to summary judgment under a supervisor sexual harassment analysis because SMHC had a reasonable policy barring sexual harassment and Murphy did not avail herself of the policy until 1 and 1/2 years after the alleged sexual harassment occurred. Defendants also contend that they are entitled to summary judgment on Murphy's retaliation claim because Murphy did not suffer any material adverse

employment action after her harassment complaint.  On April 4, 2012, plaintiffs jointly resisted defendants' Motions for Summary Judgment, arguing that Murphy's claim of sexual harassment, based on incidents predating the limitations period, are not time barred because they can be related to a series of separate but related acts occuring within the limitations period amounting to a continuing violation.  Plaintiffs further contend that they have generated genuine issues of material fact on the issue of whether defendants' conduct was sufficiently severe or pervasive to alter the conditions of their employment and creating an objectively hostile or abusive work environment.  Garvin also argues that the *Ellerth/Faragher* affirmative defense does not apply in her case because a tangible employment action was taken against her.  Garvin alternatively argues that defendants cannot establish either prong of the *Ellerth/Faragher* affirmative defense as a matter of law.  Plaintiffs also argue that they have generated genuine issues of material fact on the "causal connection" element of their *prima facie* case of retaliation.  On April 11, 2012, defendants filed their reply brief in support of their Motions for Summary Judgment.

## II.  LEGAL ANALYSIS

### A.  Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is

no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the

pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*).

The Eighth Circuit Court of Appeals recognized in a number of panel decisions that summary judgment is "disfavored" or should be used "sparingly" in employment discrimination cases. *See id.*, at 1043 (collecting such cases in an Appendix). The rationales for this "employment discrimination exception" were that "discrimination cases often turn on inferences rather than on direct evidence. . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and that "intent" is generally a central issue in employment discrimination cases. *See, e.g., Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). On the other hand, the Supreme Court recognized that, even in employment discrimination cases, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In its *en banc* decision in *Torgerson*, the Eighth Circuit Court of Appeals expressly rejected the notion that summary judgment in employment discrimination cases is considered under a separate standard, citing *Reeves* and *Celotex*. Instead, the court held as follows:

> Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no

37

> "discrimination case exception" to the application of summary
> judgment, which is a useful pretrial tool to determine whether
> any case, including one alleging discrimination, merits a trial.

*Torgerson*, 643 F.3d at 1043.

Therefore, I will apply these standards to the defendants' Motions for Summary Judgment.

However, I must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task.  Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting.  Missing in the standard incantation of summary judgment principles is the role of experience.  Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881).  Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations.

Employment discrimination and retaliation, except in the rarest cases, is difficult to prove.  It is perhaps more difficult to prove today—more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes.  Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987).  Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by

38

Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.*

Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, I turn to consideration of the parties' arguments for and against summary judgment.

### B.  Plaintiffs' Sexually Hostile Work Environment Claims

Initially, I consider defendants' arguments that they are entitled to summary judgment on both plaintiffs' sexually hostile work environment claims.∎[1]

### 1.    Elements of claim

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex."  42 U.S.C. § 2000e-2(a)(1).   As the Eighth Circuit Court of Appeals has explained, "[D]iscrimination based on sex that creates a hostile or abusive work

---

[1]In considering plaintiffs' discrimination claims, I will not distinguish between their claims under Title VII and comparable sexual discrimination claims under the ICRA.  I have previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA."  *Soto v. John Morrell & Co.*, 285 F. Supp.2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)); *see King v. United States*, 553 F.3d 1156, 1160 n.3 (8th Cir. 2009) (noting that "[b]ecause the same analysis applies to age discrimination claims under the ADEA and the ICRA," the court need not discuss plaintiff's claims under ICRA); *Christensen v. Titan Distribution, Inc.,* 481 F.3d 1085, 1095 n.4 (8th Cir. 2007) (same); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n.2 (8th Cir. 2000) ("The ICRA is interpreted to mirror federal law, including the ADEA") (citing *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999)).  This is because the Iowa Supreme Court has recognized federal precedent is applicable to discrimination claims under the ICRA.  *See Soto*, 285 F. Supp.2d at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims.  *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between the ADEA and the ICRA becomes critical, my analysis of plaintiffs' Title VII claims applies equally to their ICRA claims.

environment violates Title VII." *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845 (8th Cir. 2006) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), and *Quick*, 90 F.3d at 1377).

The elements of a claim of hostile environment sexual harassment differ somewhat, depending on whether the alleged harasser is a co-worker or a supervisor. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). To prove such a claim based on harassment by a co-worker, the plaintiff must prove the following: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take proper remedial action. *See Wilkie v. Department of Health and Human Servs.*, 638 F.3d 944, 952 (8th Cir. 2011); *Cross v. Prairie Meadows Racetrack & Casino, Inc.,* 615 F.3d 977, 981 (8th Cir. 2010); *Sutherland v. Missouri Dept. of Corrections*, 580 F.3d 748, 751 (8th Cir. 2009); *Nitschie*, 446 F.3d at 845; *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004); *McCown v. St. John's Health System*, 349 F.3d 540, 542 (8th Cir. 2003); *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002).

When the harassment is by a supervisor, however, the plaintiff must prove the first four elements listed above, and if she also proves that the harassment resulted in a tangible employment action, then the employer is vicariously liable for the supervisor's harassment. *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (describing the first four elements as the "common" elements for supervisor and co-worker harassment claims); *Cheshewalla*, 415 F.3d at 850. If she does not prove that the

supervisor's harassment resulted in a tangible employment action then the employer may escape vicarious liability by proving the following elements of the *Ellerth/Faragher* affirmative defense: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Gordon*, 469 F.3d at 1195 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)); *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 n.2 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 850-51.  The Eighth Circuit Court of Appeals has found that:

> to be considered a supervisor, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties."

*Cheshewalla*, 415 F.3d at 850-851 (quoting *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004)).

### 2.	*Murphy's sexually hostile work environment claim*

Initially, defendants contend that Murphy's sexually hostile work environment claim is time-barred under the limitations provisions of both Title VII and the ICRA. Therefore, before considering whether or not there are genuine issues of material fact on the elements of Murphy's sexually hostile work environment claim, I must determine whether the claim is barred by the allegedly untimely filing of Murphy's administrative charge.

### a.	*Limitations period*

Although both Title VII and the ICRA prohibit the same types of conduct by an employer, they differ with respect to the time limitations in which a complainant must comply. *Compare* 42 U.S.C. § 2000e-5(e)(1) (Title VII), *with* IOWA CODE § 216.15(13)

(ICRA).◨[2]  However, since Murphy filed her charges concurrently with the ICRC and the

---

[2]Title VII provides:

> (1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 42 U.S.C. § 2000e-5(e)(1).  The ICRA's provision reads:

> 13. Except as provided in section 614.8, a claim under this chapter shall not be maintained unless a complaint is filed with the commission within three hundred days after the alleged discriminatory or unfair practice occurred.

IOWA CODE § 216.15(3).

EEOC, both Title VII and the ICRA require a discriminatory incident to have occurred within the 300 days preceding the filing of an administrative complaint.[3] Accordingly, because Murphy filed her administrative complaint on September 4, 2009, her sexually hostile work environment claim is time barred if the harassing conduct accrued prior to November 8, 2008.

It is uncontested that Murphy claims that during a two week period in September 2005, Fischer-Culver twice propositioned her to engage in a sexual relationship. Murphy admits that the incidents of alleged overt sexual harassment are confined to this two week period in September 2005. Murphy also alleges that, after she rebuffed Fischer-Culver's sexual advances, Fischer-Culver engaged in a "pattern of hostility" and "stalking" leading Murphy to complain to Rixner in June 2007 about Fischer-Culver's alleged sexual harassment. All conduct to this point is still well outside the 300 day window. Accordingly, the incidents predating the limitations period are time barred unless they can be related to a timely incident as a "series of separate but related acts" amounting to a continuing violation. *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117

---

[3]Complaints brought under Title VII for unlawful employment practices generally must be filed with the EEOC within 180 days after the occurrence of the alleged act. 42 U.S.C. § 2000e-5(e)(1). However, if the aggrieved person first institutes proceedings with a state agency empowered to prosecute discriminatory employment practices, the time limit for filing with the EEOC is extended to 300 days. *Id.* Thus, under Title VII, the time in which a complainant has to file an administrative charge varies, based upon whether the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof. *Id.* States that maintain such agencies are known as "deferral states." *See, e. g., Worthington v. Union Pac. R.R.,* 948 F.2d 477, 479 n. 3 (8th Cir. 1991). Iowa is a deferral state. *See Millage v. City of Sioux City,* 258 F. Supp. 2d 976, 984-86 (N.D. Iowa 2003) (identifying the ICRC as a deferral state agency).

(2002) (Title VII); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n,* 672 N.W.2d 733, 741 (Iowa 2003) (ICRA).   In order to establish she exhausted her administrative remedies as to the whole of the alleged sexual harassment, Murphy is required to generate a genuine issue of material fact that the sexual harassment predating the limitations period was part of "continuing violation" with the sexual harassment that occurred within the limitations period.   Defendants contend that she cannot make such a showing.◻[4]   Murphy counters, arguing that she was subjected to continued ostracism from Fischer-Culver and her supporters from September 2005, through June 2010, and that this conduct constitutes a continuing violation of the sexual harassment which occurred outside the limitations period.

###### b.   *Continuing violations*

In its decision in *National Railroad Passenger Corp. v. Morgan*, the Supreme Court addressed what constituted the timely filing of Title VII claims and clarified the application of the continuing violation doctrine in Title VII hostile environment cases.   *Morgan*, 536 U.S. at 115-22; *see Jensen v. Henderson*, 315 F.3d 854, 858 (8th Cir. 2002) (discussing *Morgan*'s significance).   In *Morgan*, the Court indicated, that with respect to hostile environment claims, where each act is related to the whole, "the employee need only file a charge within [the statutory period] of any act that is part of the hostile work

---

[4]In *Farmland Foods,* the Iowa Supreme Court cited its decision in *Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512 (Iowa 1990).   In the latter case, the Iowa Supreme Court noted the ICRA is patterned after Title VII.   *Hy-Vee Food Stores, Inc.,* 453 N.W.2d at 527.   Based on the similarities between the federal and state statutes, the court considered federal cases on the "continuing violations" doctrine instructive.   *Id.* (citing *Annear v. State,* 419 N.W.2d 377, 379 (Iowa 1988)).   Consequently, I will utilize federal case law to analyze the timeliness of Murphy's claims under both federal and state law.

environment." Morgan, 536 U.S. at 118. However, the Court pointed out that if the acts have no relation to each other, "then the employee cannot recover for the previous acts, at least not by reference to the [more recent] act." *Id.* Consequently, a plaintiff may not assert a continuing violation based on past isolated instances of discrimination, even where the effects persevere into the present. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980); *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1271-72 (8th Cir. 1990).

In *Rowe v. Hussmann Corp.*, 381 F.3d 775 (8th Cir. 2004), the Eighth Circuit Court of Appeals explained what constitutes "continuing violation" harassment under *Morgan*. In *Rowe*, the court of appeals noted that even a lengthy hiatus in harassment does not necessarily establish that pre-limitations period and post-limitations period harassment are not part of a "continuing violation." *Rowe*, 381 F.3d at 780 (citing *Morgan*, 536 U.S. at 118). Instead, more pertinent factors to consider were whether the same harasser committed the same harassing acts before and after the limitations deadline; whether the employer was made aware of the earlier harassment; and whether there was any "intervening action" by the employer that could fairly be said to have caused the later acts of harassment to be unrelated to the earlier, otherwise untimely acts. *Id.* at 781. The Eighth Circuit court of Appeals re-emphasized that principle last year, holding that only "acts before and after the limitations period [that are] *so similar in nature, frequency, and severity* . . . must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to th[e] action." *Wilkie,* 638 F.3d at 951 (*quoting Rowe,* 381 F.3d at 781). In *Rowe*, the court concluded "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this

46

action." *Id.* In essence, the Eighth Circuit Court of Appeals has interpreted *Morgan* to mean that, in order for a hostile work environment complaint to be timely filed, "[o]nly the smallest portion of that 'practice' needs to occur within the limitations period." *Jensen*, 315 F.3d at 859 (quoting *Morgan*, 536 U.S. at 117).

Consequently, the question before me is whether Murphy has demonstrated the alleged timely discriminatory acts are closely related enough to constitute a continuing violation or whether they constitute discrete discriminatory acts. Unfortunately for Murphy, no reasonable juror could find the alleged acts of harassment constitute one "unlawful employment practice." Murphy has failed to show how Fischer-Culver's actions in September of 2005 are "so similar in nature, frequency and severity" to the actions which occurred between September 2005 and November 2008. *See Rowe*, 381 F.3d at 779; *accord Wilkie*, 638 F.3d at 952. First, Fischer-Culver's alleged harassing actions in September of 2005, were substantially different than those that occurred during the following three years. Fischer-Culver's alleged actions in September of 2005 can be characterized as sexual advances toward Murphy, and include two explicit requests by Fischer-Culver for Murphy to engage in a sexual relationship with her. In contrast, the actions occurring after September 2005, did not involve personal, sexual advances by Fischer-Culver toward Murphy or any other co-worker at SMHC. Instead, many of the issues Murphy allegedly encountered are in the realm of the usual inter-office politics and personality conflicts rather than a sexually hostile work environment. For instance, Murphy complains that Fischer-Culver orchestrated co-workers to hover around Murphy's office, glaring and laughing at her. Murphy, however, does not identify any co-workers who participated in these incidents or when they occurred. As a result, no meaningful analysis of these incidents is possible. Based on this summary judgment record, no

47

reasonable jury could conclude Murphy has established a continuing violation as defined by *Morgan* and its progeny. *See Morgan,* 536 U.S. at 114; *see also Mems*, 327 F.3d at 785.

In sum, Murphy's assertions consist of nothing more than an amalgamation of discrete, isolated instances of misconduct. *See Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir. 1997). Although the alleged incidents may have been frustrating and unpleasant for Murphy, no reasonable jury could find a sufficient nexus between the September 2005 instances of overt sexual harassment, and the conduct Murphy describes as occurring after word to be a continuing violation of the law. The continuing violations doctrine was not designed to allow complainants to circumvent the limitations period by bootstrapping untimely grievances to timely, but unrelated, complaints. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004) (noting the continuing violation doctrine was not intended to circumvent the rules surrounding what brings actions within the limitations period). As the Tenth Circuit Court of Appeals has observed, "Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on discriminatory acts when they occur. Unlitigated bygones are bygones." *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1308 (10th Cir. 2005). Consequently, while the untimely conduct may be relevant as background information, it cannot provide a basis for liability under either Title VII or the ICRA. *See Kline v. City of Kansas City, Mo., Fire Dep't*, 175 F.3d 660, 665 (8th Cir. 1999) (noting harassment occurring outside the limitations period may be relevant to provide background information, but that damages could only be recovered with respect to events occurring within the limitations period). Because Murphy has failed to generate a genuine issue of material fact that her untimely claim is a continuing violation, I will proceed to only

address her timely allegations, those events alleged to have occurred after November 8, 2008, with respect to the merits of Murphy's claim.

### c. Merits of Murphy's claim

Defendants argue that Murphy's sexually hostile work environment claim fails as a matter of law because the actions upon which her claim relies were neither severe nor pervasive. Murphy disagrees, arguing that, viewing the evidence in the light most favorable to her, the environment to which she was subjected was sufficiently sexually hostile to be actionable.

The element of the *prima facie* case that is in dispute here is the fourth one, whether or not the harassment affected a term, condition, or privilege of employment, *i.e.*, whether the harassment is "actionable." The Eighth Circuit Court of Appeals has explained that this element requires "a twofold inquiry":

> First, the harassment must be sufficiently severe or pervasive to create an "objectively hostile" work environment. *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004). . . . Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

*Kratzer*, 398 F.3d at 1047. The prongs of this inquiry require some deeper consideration in this case.

As to the first prong of the inquiry, whether or not the environment was "objectively hostile,"

> [the environment] must be more than merely offensive, immature or unprofessional; it must be extreme. *Id.* at 1027, citing *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). Conduct that does not exceed the threshold of

49

severity is insufficient to create a prima facie case of sexual harassment. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999).

*Kratzer*, 398 F.3d at 1047. To put it another way,

"Sexual harassment 'standards are demanding—to be actionable, conduct must be extreme and not merely rude or unpleasant.'" *Tuggle [v. Mangan]*, 348 F.3d [714,] 720 [(8th Cir. 2003)] (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). "'More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.'" *Id.* (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). [The plaintiff] must prove [her] workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

*LeGrand v. Area Resources for Community and Human Servs.*, 394 F.3d 1098, 1101-02 (8th Cir. 2005).

Determination of whether or not an environment is "objectively hostile" is "a fact-intensive inquiry." *See Moring v. Arkansas Dep't of Correction*, 243 F.3d at 452, 456 (8th Cir. 2001) (citing *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). Although a single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation, *see Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997), there is no "rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment." *Moring*, 243 F.3d at 456. Thus, "[w]hether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity

50

of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005); *LeGrand*, 394 F.3d at 1102 (same factors).

As to the second prong of the inquiry, whether or not the environment was "subjectively hostile," "'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (quoting *Harris*, 510 U.S. at 21); *accord Kratzer*, 398 F.3d at 1047 (also citing *Harris*). "[A]n employee's admission that [the environment] was not abusive is fatal to the employee's Title VII sexual harassment claim." *Kratzer*, 398 F.3d at 1047 (citing *Montandon v. Farmland Ind., Inc.*, 116 F.3d 355 (8th Cir. 1997), and *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)).

I must determine whether Murphy has generated genuine issues of material fact on both of these prongs of the "actionable harassment" element to defeat the defendants' Motion for Summary Judgment on her sexually hostile work environment claim. Viewing the summary judgment record in the light most favorable to Murphy, none of the issues or actions Murphy encountered after November 8, 2008, carry any sexually harassing inference and, instead, appear to have stemmed from either inter-office politics and personality conflicts or retaliation. While the alleged incidents may have been frustrating for Murphy, I cannot find that these alleged incidents, either alone or in combination, amount to an actionable hostile work environment claim that can survive summary judgment. *See Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007)

(holding allegations that employee was denied a route assistant, was unfairly disciplined, paid less than the male workers, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, at best, amounted to a frustrating work environment rather than an objectively hostile work environment), *abrogated on other grounds by Torgerson,* 643 F.3d 1031, at 1042–43, 1058; *Bradley v. Widnall,* 232 F.3d 626 (8th Cir. 2000) (finding employee's "frustrating work situation" characterized by her being excluded from the decision-making process, treated with disrespect, subjected to false complaints, and curtailed in her supervisory duties did not amount to hostile work environment), *abrogated on other grounds by Torgerson,* 643 F.3d at 1042–43, 1058; *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1159 (8th Cir. 1999) (concluding unfair criticism and being yelled at did not amount to actionable harassment); *see also Martinelli v. Penn Miller Ins. Co.,* 269 Fed. App'x 226, 228 (3d Cir. 2008) (finding employer's scrutiny of employee's work, "while unpleasant and annoying" did not amount to hostile work environment); *Harbuck v. Teets,* 152 Fed. Appx. 846, 847–48 (11th Cir. 2005) (holding employer's conduct, including keeping workplace too cold, subjecting employee to heightened scrutiny, and disclosing information from plaintiff's prior lawsuit to her co-workers, did not constitute a hostile work environment).

I find that Murphy has failed to generate genuine issues of material fact on the "objectively hostile" prong of the "actionable harassment" element of her hostile environment claim. Consequently, defendants' Motion for Summary Judgment on Murphy's sexually hostile environment claim is granted.

### 3. *Garvin's sexually hostile work environment claim*

#### a. *Actionable harassment*

Defendants also argue that Garvin's sexually hostile work environment claim fails as a matter of law because the actions upon which her claim relies were neither severe nor pervasive. Garvin argues that, viewing the evidence in the light most favorable to her, the environment to which she was subjected was sufficiently sexually hostile to be actionable.

Unlike Murphy's claim, Garvin's sexually hostile work environment claim includes Fischer-Culver's overt and explicit propositions to Garvin to engage in a sexual relationship. Moreover, before allegedly propositioning Garvin, the undisputed facts allow for a reasonable inference that Fischer-Culver was grooming Garvin for sexual favors. This grooming behavior included Fischer-Culver asking Garvin highly personal questions when the two traveled together to a workshop in Des Moines in early March, 2009. Fischer-Culver's inquiries included asking Garvin how she met her husband and about her mental illness diagnoses. Garvin found Fischer-Culver's questions personally invasive. Shortly after their trip together, Fischer-Culver sent Garvin a text message asking her to get a Facebook page. Once Garvin had done so, Fischer-Culver immediately requested that Garvin make her a "Facebook friend." When Garvin was home sick on March 18, 2009, Fischer-Culver called Garvin at home to inquire about her condition. Garvin found Fischer-Culver's conduct and questions personally invasive. Two days later, on March 20, during a lengthy telephone conversation, Fischer-Culver volunteered private information about herself to Garvin, including sharing information about an incestuous relationship she had experienced and anti-anxiety medication she was taking. The following day, on March 21, Fischer-Culver sent Garvin a text message via Facebook asking Garvin to look at the photographs on Fischer-Culver's Facebook page for the image

of a woman bearing a striking resemblance to Garvin.  Fischer-Culver explained to Garvin that this woman had been very important to her.

Garvin claims that following this period of grooming, Fischer-Culver made overt and explicit propositions to her to engage in a sexual relationship.  On March 22, 2009, during a Facebook chat between Garvin and Fischer-Culver, Fischer-Culver asked Garvin if, hypothetically, she would have a relationship with her.  The following day, March 23, when Garvin came to her office, she found the book "Imagine a Woman in Love with Herself", open and sitting on her desk with a note from Fischer-Culver which read:  "This is the section I first opened to today.  I read it and it is exactly how I am feeling. . . .Tell me what you think."  The section contained a discussion of experiencing bodily sensations, including an "ache in my heart", "tingling in my genitals", and "fire rising in my neck." Later that day, Fischer-Culver came to Garvin's office, asked Garvin about "our relationship" and began to touching Garvin's arm.  Garvin became upset and told Fischer-Culver that she couldn't talk "about these sex things--sex things anymore."  Fischer-Culver responded by asking Garvin, "what about what we've had?  What about the last two weeks?"  Then, on March 27, Fischer-Culver, again, asked Garvin, during an on-line chat, to engage in a sexual relationship with her.  Later that day, Fischer-Culver asked if Garvin would share a room with her at an upcoming conference in Des Moines. Fischer-Culver later told Garvin that she could not share a room with Garvin because she would want to kiss Garvin.  Fischer-Culver continued to make unsolicited telephone calls and send text messages to Garvin up to March 30, 2009.

In light of this record, Garvin has generated genuine issues of material fact that she was subjected to a subjectively and objectively harassing environment.  Garvin alleges that Fischer-Culver's conduct in pursuing a relationship with her occurred repeatedly and even

after she told Fischer-Culver that she couldn't talk about "sex things" with her anymore. Fischer-Culver denies making repeated telephone calls and sending text messages to Garvin. She also denies telling Garvin that she would want to kiss her if they shared a room together. I find that Garvin has generated genuine issues of material fact on the "actionable harassment" element of her sexually hostile work environment claim. Consequently, this portion of defendants' Motion for Summary Judgment is denied. Therefore, I turn to the defendants' alleged *Ellerth/Faragher* affirmative defense.

### b. The Ellerth/Faragher affirmative defense

Defendants argue that SMHC cannot be held liable for Fischer-Culver's alleged harassment of Garvin because Garvin failed to take advantage of SMHC's sexual harassment policy and that SMHC, once notified of the alleged harassment, took prompt remedial action reasonably calculated to stop the harassment. Garvin responds that the *Ellerth/Faragher* affirmative defense does not apply in her case, because a tangible employment action was taken against her. Garvin alternatively argues that defendants cannot establish either prong of the defense as a matter of law.

### i.     Tangible employment action

If the plaintiff establishes harassment by a "supervisor," then the employer is vicariously liable, unless the employer demonstrates that it is entitled to the *Ellerth/Faragher* affirmative defense. *Jenkins v. Winter,* 540 F.3d 742, 748-49 (8th Cir. 2008) (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 807-08 (1998)). That affirmative defense provides that, if the employer exercised reasonable care to avoid harassment and to eliminate it when it might occur, and the complaining employee failed to act with like reasonable care to take advantage of the employer's safeguards or otherwise to prevent harm that could be

avoided, then the employer is not liable. *Adams v. O'Reilly Automotive, Inc.,* 538 F.3d 926, 930 (8th Cir. 2008). The affirmative defense is unavailable, however, if the employee suffers a tangible employment action as a result of the harassment. *Jenkins,* 540 F.3d at 749. As the Eighth Circuit Court of Appeals has explained, "'A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Brenneman v. Famous Dave's of Am., Inc.,* 507 F.3d 1139, 1144 (8th Cir. 2007), with internal quotation marks omitted).

Garvin argues the *Ellerth/Faragher* affirmative defense is inapplicable here because she was constructively discharged as a result of the harassment. The United States Supreme Court has held that constructive discharge is a tangible employment action for purposes of applying *Ellerth/Faragher,* but only when an official act underlies the constructive discharge. *See Pennsylvania State Police v. Suders,* 542 U.S. 129, 140-41 (2004); *see also Whitten v. Fred's Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (noting "only constructive discharges that are precipitated by an official act qualify as tangible employment actions . . ."); *Chapman v. Carmike Cinemas*, 307 F.3d App'x 164, 169 (10th Cir. 2009) (observing that an employer may invoke the *Ellerth/Faragher* affirmative defense when "'an official act does not underlie the constructive discharge'") (quoting *Suders,* 542 U.S. at 148). Thus, if Garvin was subject to an official act that led to her constructive discharge, SMHC may not avail itself of the *Ellerth/Faragher* affirmative defense.

Here, Garvin has generated a genuine issue of material fact as to whether Fischer-Culver's actions were tied to an official act. In *Suders,* the Court used the example of a harassing supervisor who gives an employee a dangerous job assignment to retaliate for

56

spurned sexual advances, thus forcing the employee to resign. *Suders,* 542 U.S. at 150 (citing *Reed v. MBNA Marketing Sys., Inc.,* 333 F.3d 27, 33 (1st Cir. 2003)).  Under this scenario, the Court explained, the constructive discharge would be the result of an official act, precluding the employer from asserting the affirmative defense. *Id.*  To prove a constructive discharge, the plaintiff must prove that her employer rendered the employee's working conditions intolerable, forcing the employee to quit. *See Brenneman v. Famous Dave's*, 507 F.3d 1139, 1144 (8th Cir. 2007); *Tatum,* 411 F.3d at 960; *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3d 349, 354 (8th Cir. 1997); *Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 574 (8th Cir. 1997). "Behavior that can be characterized as 'merely offensive' is not actionable, but 'a tangible psychological injury' on the part of the employee is not required for the employer's behavior to be illegal." *Delph,* 130 F.3d at 354 (quoting *Harris,* 510 U.S. at 21).  If the plaintiff is to succeed on such a claim, the conduct complained of must have been "severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive." *Id.* (quoting *Harris,* 510 U.S. at 21).  In addition, the environment must be perceived subjectively by the victim as hostile, or the conduct cannot be said to have "actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* (quoting *Harris,* 510 U.S. at 21-22) (citing *Kimzey,* 107 F.3d at 573). The Eighth Circuit Court of Appeals has held that "the employer's actions leading to the decision to quit must have been deliberate, and taken with the intention of forcing the employee to quit." *Id.* (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir. 1981)). In the alternative, where conscious intent is absent, the intention element may nevertheless be satisfied by proof demonstrating the employee's "resignation was a reasonably foreseeable consequence" of the hostile atmosphere of the

plaintiff's workplace. *Id.* (citing *Hukkanen v. Int'l Union of Operating Eng'rs Local 101,* 3 F.3d 281, 285 (8th Cir. 1993)).

Taking the evidence in the light most favorable to Garvin, Garvin has generated a genuine issue of material fact as to whether Fischer-Culver's actions were tied to her official role as Garvin's supervisor, and whether her actions toward Garvin involved a direct exercise of SMHC's authority. *See id.* Although many of Fischer-Culver's actions occurred after work during telephone calls, text messages, and on-line chats with Garvin, a number of her actions are alleged to have occurred in the workplace during work hours. Therefore, any alleged constructive discharge that Garvin suffered on account of Fischer-Culver's actions may have constituted a tangible employment action for purposes of applying *Ellerth/Faragher*. Having so concluded, I am unable to determine whether that affirmative defense is available to SMHC.

Assuming, *arguendo*, that the *Ellerth/Faragher* affirmative defense is available, I will address whether SMHC qualifies for the affirmative defense set forth in *Ellerth* and *Faragher*. The burden is on SMHC to prove that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) Garvin "unreasonably failed to take advantage of any preventive or corrective opportunities" provided by SMHC, or "to avoid harm otherwise." *Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 807.

### ii.     Does SMHC meet the defense's requirements?

Initially, I must determine whether SMHC can prove that it exercised reasonable care to prevent and correct the alleged sexual harassment. SMHC argues that it has in place a sexual harassment policy with specific information about how an employee may report a claim of harassment. Garvin counters that she received no training on the policy.

This is particularly significant because the first part of the affirmative defense asks whether the employer exercised reasonable care to *prevent* any sexual harassment. *See Faragher,* 524 U.S. at 807. Garvin further points out that, after she sought to obtain a copy of SMHC's sexual harassment policy, it took two months for SMHC to provide her with a copy. Garvin also points to her expert's opinion that:

> The sexual harassment prevention and remediation programs in place at SMHC at the time of the events at issue do not meet minimal standards for organizational practice and care. The policy is deficient in a number of ways; posting, distribution and training were non-existent; the lines of reporting limited and unclear, and disciplinary and other remedial procedures not designed to prevent problem recurrence. The Center displayed virtually no interest or foresight with respect to the problem; it appears to have been "not on the radar" screen.

Fitzgerald Report at 4; Plaintiffs' App. at 133. These circumstances, when combined with the fact that Rixner did not document Murphy's earlier complaint about Fischer-Culver because he did not consider it to be a sexual harassment complaint, generate a genuine issue of material fact about whether SMHC "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and require that this portion of defendant's Motion for Summary Judgment be denied.

## C. Plaintiffs' Retaliation Claims

Both Garvin and Murphy claim they were victims of retaliation for lodging sexual harassment complaints. Defendants also seek summary judgment on these claims and contend that neither plaintiff suffered any material adverse employment action after her complaint of harassment.

In addition to its prohibitions on sexually discriminatory treatment and the creation of a sexually hostile work environment, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). On the other hand, "'[f]iling a complaint [of discrimination] does not clothe [the plaintiff] with immunity for past and present inadequacies.'" *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (quoting *Calder v. TCI Cablevision of Mo.*, 298 F.3d 723, 731 (8th Cir. 2002), with internal quotations in *Calder* omitted). When plaintiffs present "no direct evidence of retaliation, [the court will] analyze [the] claim pursuant to the *McDonnell Douglas* burden-shifting analysis." *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007).

### *1.    A prima facie case*

To establish a *prima facie* case of retaliation, each plaintiff must demonstrate the following: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Wegner v. City of Ladue*, 500 F.3d 710, 726 (8th cir. 2007); *Wells*, 469 F.3d at 702; *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 851. Defendants' motions challenge the third element of plaintiffs' *prima facie* cases. Before addressing the third element, I must briefly address the first element.

### *a.    Protected activity*

To constitute protected activity, as the basis for the first element of a retaliation claim, each plaintiff's complaint must involve conduct that a reasonable person could have

found violated Title VII, that is, conduct that could reasonably be found to be sexual discrimination or could reasonably be found to be sexual harassment, *i.e.*, so severe or pervasive as to alter a term or condition of employment. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (*per curiam*); *Curd v. Hank's Discount Fine Furniture, Inc.*, 272 F.3d 1039, 1041 (8th Cir. 2001). There is no doubt that both Garvin and Murphy complained to Rixner about Fischer-Culver's conduct. Murphy complained to Rixner not only on her own behalf in 2007, but again in 2009, on Garvin's behalf, when she heard that Garvin was being harassed by Fischer-Culver. Thus, there is no question that plaintiffs engaged in a protected activity by reporting Fischer-Culver's actions. *See Singletary v. Missouri Dep't of Corrections*, 423 F.3d 886, 892 (8th Cir. 2005).

### b.   *Causal connection*

The Eighth Circuit Court of Appeals has explained the requirements to prove the "causal connection" element, the third element of a prima facie case of retaliation, as follows:

> To prove a causal connection, [the plaintiff] must demonstrate the defendants' "retaliatory motive played a part in the adverse employment action." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 896-97 (8th Cir. 2002) (quotation omitted). Evidence giving rise to an inference of retaliatory motive on the part of the employer is sufficient to establish the requisite causal link. *Id.* at 897. "An inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted).

*Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007); *see also Wells*, 469 F.3d at 702 ("'A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive'") (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005)).   A lack of causal connection can also be "reinforced" by undisputed evidence of customer or co-worker complaints against the plaintiff.  *Wells*, 469 F.3d at 702.   Similarly, other intervening events between protected activity and adverse action may "erode" any causal connection suggested by temporal proximity between protected activity and adverse action.  *Cheshewalla*, 415 F.3d at 852.

I find that plaintiffs have generated genuine issues of material fact on the "causal connection" element of their *prima facie* case of retaliation.   As the Eighth Circuit Court of Appeals has explained,

> Although we have opined that the "timing of [a] termination can be close enough to establish causation in a prima facie case," *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1037 (8th Cir. 2005), we have repeatedly stated that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *see also Haas*, 409 F.3d at 1037.   Furthermore, "[o]ur recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002).

*Thompson*, 463 F.3d 821, 826 (8th Cir. 2006); *accord Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (noting that Eighth Circuit cases "create a complicated picture" concerning the role of timing in retaliation claims).   Here, plaintiffs contends that their constructive discharges followed on the heels of their complaints to

62

Rixner about Fischer-Culver's alleged sexual harassment. Giving plaintiffs the benefit of all reasonable inferences that can be drawn from the record, a retaliatory motive can be inferred from SMHC's reduction of Murphy's working hours, after she complained on Garvin's behalf, and SMHC's decision to hire another child therapist in the spring of 2010, even though Murphy had informed SMHC that she was ready, willing, and able to resume working full-time. SMHC's retaliatory motive toward Garvin may be inferred from its failure to take any action to intercede on Garvin's behalf after she complained that she was being ostracized by her co-workers for her complaint against Fischer-Culver. A juror could reasonably infer that SMHC's inaction demonstrates its tacit approval of such conduct. Given this record, I conclude plaintiffs have generated a genuine issue of material fact on the causal connection defendants' adverse employment action and plaintiffs' protected activity. Therefore, this portion of defendants' Motions for Summary Judgment are denied.

### III.  CONCLUSION

Giving Garvin and Murphy the benefit of all reasonable inferences that can be drawn from the record, and recognizing that a court must not weigh the evidence, but may only determine whether there are genuine issues for trial, *see Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005)(the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial), I conclude that Murphy has generated genuine issues of material fact on her retaliation claim, and that Garvin has generated genuine issues of material fact on both her sexually hostile work environment claim and retaliation claim. Defendants' Motion for Summary Judgment as to Murphy is

63

**granted** as to Murphy's sexually hostile work environment claim but **denied** on Murphy's retaliation claim.   Defendants' Motion For Summary Judgment as to Garvin is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 18th day of May, 2012.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA